J-S09015-19

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| IN RE: ADOPTION OF: D.J.B. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: W.P.B., BIRTH MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1122 WDA 2018 |

Appeal from the Order Entered June 28, 2018
In the Court of Common Pleas of Westmoreland County
Orphans' Court at No(s):  No. 31 of 2018

BEFORE:   PANELLA, P.J., LAZARUS, J., and STRASSBURGER*, J.

MEMORANDUM BY PANELLA, P.J.:                    FILED APRIL 5, 2019

Appellant, W.P.B., ("Mother") appeals from the order involuntarily terminating her parental rights to her minor son, D.J.B. ("Child") (born in October of 2015), pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(2), (8) and (b).  We affirm.

The relevant facts and procedural history of this case are as follows. Mother and O.J.B. ("Father") were married.[1]  When Child was born, Father

_____

* Retired Senior Judge assigned to the Superior Court.

[1] By separate order entered June 28, 2018, the trial court involuntarily terminated the parental rights of O.J.B. ("Father") to Child.  Father is not a party to this appeal nor did he file a separate appeal.

was incarcerated and remains incarcerated. Father is a Megan's Law Tier III Sexually Violent Predator. Mother and Father are now divorced.

On or about October 14, 2015, the Westmoreland County Children's Bureau ("the Agency") became involved with the family regarding concerns for Mother's ability to parent Child. Trial Court's Adjudication of Dependency Findings of Fact, 3/5/16, at 1. The Agency, through Project STAR, provided hands-on parenting services, which did not begin until January 7, 2016. See id.

Even with the parenting services, the Agency continued to be concerned about Mother's parenting skills. These concerns arose from observations that Mother was rough with Child, Mother left Child unattended in the apartment, and Mother was sleeping with Child in her bed and leaving Child unattended even after he started to be able to roll over. See id. On February 8, 2016, the trial court granted emergency custody of Child to the Agency based on overwhelming concerns that Mother's parenting behavior placed Child at risk of imminent harm and general protective services were insufficient to ensure that Mother could maintain the safety of Child. See id.

At the shelter care hearing, the trial court determined that Child would remain in the Agency's custody pending the dependency hearing. See id. Shortly thereafter, the trial court adjudicated Child dependent and placed him in kinship foster care with his maternal aunt ("Foster Mother"). This adjudication was made final on March 5, 2016. N.T., 6/28/18, at 5.

Mother also received visitations. With Mother's agreement, the trial court ordered Mother to: (1) complete a mental health evaluation; (2) follow any recommendations for mental health treatment; (3) participate in parenting services; and (4) participate in sexual abuse non-offenders treatment until successfully discharged. See id. at 4-9. Mother also received visitations with Child, which were either monitored or supervised. See id. at 9.

Several permanency review hearings were held from 2016 through 2018. On February 27, 2018, the Agency filed a petition to involuntarily terminate Mother's parental rights to Child. At the hearing on the petition, Child was represented by a guardian ad litem and child advocate.[2] The

_____

[2] In *In re Adoption of L.B.M.*, 161 A.3d 172, 180 (Pa. 2017) (plurality), our Supreme Court held that 23 Pa.C.S.A. § 2313(a) requires counsel be appointed to represent the legal interests of any child involved in a contested involuntary termination proceeding. The Court defined a child's legal interest as synonymous with his or her preferred outcome. See id. In *In re T.S.*, 192 A.3d 1080, 1088 (Pa. Super. 2018), the Supreme Court held that the trial court did not err in allowing the children's GAL to act as their sole representative during the termination proceeding because, at two and three years old, they were incapable of expressing their preferred outcome. The Court explained, "if the preferred outcome of the child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests; as such, the mandate of Section 2313(a) of the Adoption Act that counsel be appointed 'to represent the child,' 23 Pa.C.S. § 2313(a), is satisfied where the court has appointed an attorney-[GAL] who represents the child's best interests during such proceedings." Id. at 1091-1092. Here, Attorney Rochelle Bosack, Esquire, served as both legal counsel and GAL for Child. At the hearing on the termination petition, Attorney Bosack actively conducted questioning of the witnesses and made legal argument on behalf of Child.
(Footnote Continued Next Page)

Agency presented the testimony of Misti Newhouse, caseworker for the Agency; ViJaya Greene, a supervisor for Project STAR; and Rayna Carter, a clinician for Project STAR. Mother, represented by counsel, testified on her own behalf. On the same day, the trial court entered its order terminating Mother's parental rights to Child pursuant to 23 Pa.C.S. § 2511(a)(2), (8), and (b). On August 13, 2018, Mother timely filed a notice of appeal, along with a concise statement, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

In her Brief on appeal, Mother raises the following issues:

1. Whether the trial court committed an error of law and/or abused its discretion by finding the petitioner, the Agency, met its strict burden of proving the statutory elements relied upon for the termination of Mother's parental rights by clear and convincing evidence?

2. Whether the trial court erred by finding that the termination of Mother's parental rights would promote the developmental, physical and emotional needs and welfare of minor Child pursuant to 23 Pa.C.S. § 2511(a)(8)?

3. Whether the trial court erred by failing to give adequate consideration to the effect that the termination of Mother's parental rights would have on the developmental, physical and emotional needs and welfare of Child under 23 Pa.C.S. § 2511(b)?

Mother's Brief at 6-7.

(Footnote Continued) ————————————

We can discern no conflict in the legal interests and the best interests of Child in this matter. Child was too young (under three years old) to express a preferred outcome at the time of the hearing. See, N.T., 6/28/18, at 1.

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> Appellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.
>
> …[T]here are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

In re Adoption of S.P., 47 A.3d 817, 826-27 (Pa. 2012) (citations omitted).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. In re R.N.J., 985 A.2d 273, 276 (Pa. Super. 2009). Clear and convincing evidence has been defined as "testimony that is so clear,

direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." Id. (internal quotation marks and citation omitted).

In terminating Mother's parental rights, the trial court relied upon Section 2511(a)(2), (8) and (b) of the Adoption Act. However, this Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of Section 2511(a). See In re B.L.W., 843 A.2d 380, 384 (Pa. Super. 2004) (en banc). As we find the evidence sufficient to support the trial court's decision pursuant to subsection (a)(2), we need not address its conclusions under subsection (a)(8).

Our Supreme Court set forth our inquiry under Section 2511(a)(2) as follows.

> As stated above, § 2511(a)(2) provides statutory grounds for termination of parental rights where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." . . .
>
> This Court has addressed incapacity sufficient for termination under § 2511(a)(2):
>
> A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded

> that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

In re Adoption of S.P., 47 A.3d at 827 (Pa. 2012) (citation omitted).

To satisfy the requirements of Section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. See In re Adoption of M.E.P., 825 A.2d 1266, 1272 (Pa. Super. 2003). Termination of parental rights under Section 2511(a)(2) is not limited to affirmative misconduct; those grounds may include acts of refusal as well as incapacity to perform parental duties. See In re A.L.D. 797 A.2d 326, 337 (Pa. Super. 2002). This Court has long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. See id. "A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." Id.

Mother first contends that the trial court abused its discretion by finding that the Agency met its strict burden of proving the statutory elements relied upon for the termination of Mother's parental rights by clear and convincing evidence. Mother's Brief at 17. We disagree.

Here, the trial court provided the following analysis pursuant to Section 2511(a)(2) and (8):

Initially, [M]other responded well to services offered through Project [STAR], and she had overnight periods of custody, but then [M]other allowed a known, convicted violent offender, [C.J.], to move into her apartment.

[M]other then began to demonstrate aggressiveness toward [Child], who was only two years of age. (Previously, [M]other had been appropriate, but needed prompting in order to identify [C]hild's needs). During visits, [M]other would become distracted, watch TV, often yell and demonstrate age-inappropriate expectations of [C]hild.

Though [M]other expressed a willingness to cooperate and improve through the services offered, [C]hild's safety when in her custody was uncertain. The Guardian ad Litem noted that [M]other is gullible, and [C]hild could easily be endangered.

ViJaya Greene of Project Star supervised [M]other's visits for two years. [Green] was convincing in [her] testimony that [M]other needed therapy to assist her in soothing and comforting [C]hild; that [M]other was brusque with [C]hild; [Mother] did not understand [C]hild's crying; [Mother] does not seem able to engage in age-appropriate activities; and [Mother] cannot seem to plan basic child activities.

[M]other's bipolar personality disorder is a factor in assessing [Child's] safety. [Mother] has demonstrated explosiveness and can be verbally abusive without warning. [M]other's love for [C]hild has been demonstrated, but her child-care [abilities are] terribly deficient. In [C]hild's early months, muscle development was delayed, [C]hild was often left too long in one position on [his] swing, causing a flat-head and weak neck support. [With] simple things, [M]other had no [knowledge] and needed constant prompting.

[M]other testified she has tried hard to keep [C]hild and does not want a termination of [her] parental rights, but she admits she has mood swings. [Mother] believes she could be trusted with [C]hild, because her brother will always check on her.

- 8 -

Trial Court Opinion, 10/11/18, at 1-2. The trial court found that multiple services were offered to Mother, but Mother made no progress toward what can properly be described as basic parenting competencies. See id. at 1. The trial court, thus, concluded that the Agency established grounds for termination pursuant to Section 2511(a)(2), and (8). See id. at 2.

These findings are all well supported by the record. At the hearing, the Agency first presented Newhouse. Newhouse testified that she was first assigned as the caseworker for Child on December 11, 2015. N.T., 6/28/18, at 4. Newhouse stated that Child was placed in the Agency's custody on February 8, 2016, and adjudicated dependent on February 19, 2016. See id. at 4-5. Newhouse testified that Child has been out of Mother's care and in foster care for almost two and a half years. See id. Newhouse stated that Child was removed from Mother's care because of ongoing concerns for Child's safety such as: (1) Mother was being very rough with Child; (2) Mother continued to sleep with Child after being advised not to due to suffocation; and (3) Mother left Child in the apartment alone for an unspecified period of time. See id. at 5.

Newhouse reported that Mother's compliance was moderate at the August 3, 2016, permanency review hearing; Mother's compliance was substantial at both the February 6, 2017; and August 23, 2017 permanency review hearings; and Mother's compliance reverted back to moderate at the February 12, 2018 permanency review hearing. See id. at 17. Newhouse

informed the trial court that Mother was ordered: (1) to complete a mental health evaluation; (2) to follow any recommendations for mental health treatment; (3) to participate in parenting services; and (4) to participate in sexual abuse non-offenders treatment until successfully discharged. See id. at 8. Newhouse stated that Mother was discharged successfully from her sexual non-offender's therapy program, and Mother completed the comprehensive parenting assessment. Id. at 9. Newhouse testified that the parenting assessment identified that Mother struggles with age-appropriate expectations for Child. Id. Newhouse further stated that Mother was given guidance and tips from the parenting services on how to properly parent Child, but struggled with consistently applying them without prompting. Id. at 8-9.

Newhouse stated that Mother's apartment at the time Child was removed was unfit as there was visible mold and paint peeling from the ceiling and walls. See id. at 6-7. Newhouse noted that Child hit his head on a wall and Mother displayed no concern for his safety and failed to notice a bump on Child's head. See id. at 6. Newhouse stated that Mother initially had supervised visits at her house, but the visits were moved to Project STAR due to the health and safety concerns regarding Mother's house. See id. at 10-11. Newhouse stated that, after Child came into the Agency's custody, Mother moved into Section 8 housing. See id. at 6. Newhouse testified that Mother is currently living in a stable two-bedroom apartment,

and Mother receives disability as her source of income. See id. at 14-15. Newhouse stated that Mother has difficulty maintaining food at home because of her inability to budget her money. See id. at 27.

Newhouse noted that, when the visits were held at Project STAR, Mother needed prompting for feeding Child, changing Child, and taking care of Child's basic needs. See id. at 10. Newhouse testified that, as Child got older, Mother retained more parenting information and showed improvement in her parenting skills. See id. Newhouse informed the court that Mother's supervised visits changed to monitored visits and eventually to overnight visits at her house. See id.

Newhouse testified that, after the Agency received notice that Mother had a male individual, C.J., residing in her home, who was known to the Agency to be very violent, the Agency moved the visits back to Project STAR due to concerns for Child's safety. See id. at 11. Newhouse further testified that the location change for the visits led to a downward spiral with Mother's behavior. See id. at 30. Newhouse stated that Mother was observed being rough with Child, grabbing Child's arm, and yelling at Child. See id. at 12. Newhouse noted that there continued to be concerns with Mother's frustration, agitation, and aggressiveness towards Child. See id. at 11. Newhouse reported that Mother also became frustrated and verbally aggressive with staff at Project STAR, which raised concerns for Child's safety in her care. See id. at 12.

Newhouse informed the court that Child was placed in a kinship foster home with Foster Mother, who is Mother's sister. See id. at 13. Newhouse testified that Mother's visits were changed to one supervised visit per week at Project STAR and the rest of her visits were supervised at Foster Mother's home. See id. Newhouse stated that Foster Mother had concerns with Mother's lack of interaction with Child because Mother would watch TV, play on her phone, nap, and not pay attention to or interact with Child. See id. at 14. Newhouse testified that she still has apprehensions with Mother's ability to retain parenting information and properly apply the parenting skills and guidance to safely care for Child. See id. at 18.

Next, the Agency presented Green as an expert in the field of supervised visitation. See id. at 38. Green testified that she is currently employed by Project STAR as an intensive family support supervisor. See id. Green stated that, prior to her promotion to supervisor, she was a behavioral health clinician who supervised Mother's visits with Child from February of 2016 until February of 2018. See id. at 36-40.

Green informed the court that Mother's visits were initially at Project STAR. See id. at 40. Green testified that Mother struggled to nurture, comfort and safeguard Child from danger. See id. at 39-40. Green specifically testified that, when Child was three months old, Mother would forget to consistently support Child's neck and head when holding Child, and needed constant prompting. See id. at 51. Green also noted that Mother

would burp Child too hard. See id. at 40. Green stated that, even with parenting suggestions, Mother struggled to understand and set age-appropriate expectations for Child. See id. at 40-41.

Green informed the court that she tried to help Mother come up with ways to entertain Child, create structure during her visitations with Child, and set meal times for Child. See id. at 43. Green testified that Mother started to become more receptive to parenting suggestions and started to retain some of the parenting information. See id. at 40-41. Green stated that Mother, however, still struggled to understand and set age-appropriate expectations. See id.

Green testified that, around April of 2017, Mother's visits were switched from supervised to monitored visits at her house. See id. at 41-43. Ms. Green noted that Mother appeared more relaxed in her home. See id. at 41. Green testified that, after the Agency received notice that Mother started living with C.J., a convicted violent offender, Mother became extremely angry when the visits were relocated back to Project STAR. See id. at 44. Green testified that, when Mother gets angry, she screams, gets verbally abusive, and is unable to control her temper. See id. at 46.

Green testified that, when Mother is highly agitated, she is not patient or nurturing with Child. See id. at 47. Green testified that Mother was diagnosed with bipolar disorder. See id. at 46. Ms. Green further testified that, even though Mother is compliant with her mental health treatment, she

still has concerns about Mother's explosive temper, her anger issues and her ability to parent Child safely. See id.

Finally, the Agency offered Carter as an expert to testify regarding parent-child psychology issues and parent-child attachment. See id. at 58. Carter testified that she is a behavioral health clinician at Project STAR. See id. at 57. Carter started working with Mother and Child in August of 2017 and replaced Green around March of 2018. See id. at 59.

Carter supervised Mother's visits and made unannounced visits to observe Mother. See id. Carter noticed that there were several instances where Mother became very agitated during the visitations at Mother's home. See id.

Carter also recalled that, during one visit, Mother failed to react immediately when Child hit his head on the edge of the table. See id. at 61. Carter stated that, when she suggested Mother place either ice or a cold compress on Child's head, Mother initially made excuses and became agitated instead of trying to help the swelling go down. See id.

Carter stated that Mother's behavior improved when she was prescribed Lithium to take at night. See id. at 65. Carter noticed that Mother appeared calmer with Child and not easily agitated by Child. See id. at 66. In contrast, Carter noticed when Mother switched from Lithium to Klonopin in February 2018, she appeared very impatient and agitated. See id. at 67.

Mother testified that Child was removed from her custodial care on February 8, 2016. See id. at 71. Mother testified that when Child was born, she was married to Father. See id. at 73-74. Mother stated that she is currently divorced from Father. See id. at 93. Mother testified that she divorced Father so she could be reunified with Child. See id. at 71-72.

Mother admitted that she was living in a building contaminated by mold when Child was removed from her custody. See id. at 75. Mother stated that she currently resides in a two-bedroom house. See id. at 70.

Mother testified that she currently participates in mental health treatment, takes prescribed medication, and receives financial assistance. See id. at 95-97. Mother stated that she pushes herself to learn parenting skills to be a good mother for Child and to remove Child from foster care. See id. at 72, 80. Mother testified that she loves Child and believes she can keep Child safe. See id. at 97-98.

After a careful review of the record, we conclude the testimonial evidence supports termination of Mother's parental rights pursuant to Section 2511(a)(2) in that Mother has demonstrated a repeated and continued incapacity, abuse, neglect or refusal that has caused Child to be without essential parental care, control or subsistence necessary for his physical or mental well-being, and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by Mother, is supported by competent, clear and convincing evidence.

Consequently, we find no abuse of discretion in the trial court's evaluation of Section 2511(a)(2) with respect to Mother.

Turning to Mother's third and final issue on appeal, Mother argues the court erred in concluding the Agency met its burden under section 2511(b). This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). See In re Adoption of C.L.G., 956 A.2d 999, 1008 (Pa. Super. 2008) (en banc). In reviewing the evidence in support of termination under Section 2511(b), our Supreme Court has stated as follows.

> If the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." ...[T]his Court has held that the determination of the child's needs and welfare requires consideration of the emotional bonds between the parent and child. The utmost attention should be paid to discerning the effect on the child of permanently severing the parental bond.

In re: T.S.M., 71 A.3d 251, 267 (Pa. 2013) (internal quotation marks and citations omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." In re Z.P., 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances . . .

where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." In re K.Z.S., 946 A.2d 753, 762 (Pa. Super. 2008).

Here, Mother argues that the trial court erred by failing to give adequate consideration to the effect that the termination of her parental rights would have on the developmental, physical and emotional needs and welfare of Child under Section 2511(b). See Mother's Brief at 22. We disagree.

At the hearing, Newhouse testified that Child is in a kinship foster home, and Foster Mother and Mother have a good relationship. See N.T., 6/28/18, at 21. Newhouse stated that Child has resided at the pre-adoptive foster home for 21 months. See id. at 20. Newhouse testified that Child's needs are being met by Foster Mother, and Child is thriving with his Foster family. See id.

Newhouse observed that Child gets along well with his Foster siblings. See id. at 25. She opined that Child has a close relationship with Foster Mother, and Child views Foster Mother as his mother. See id. Newhouse also stated that Mother is bonded with Child. See id. at 26. Newhouse testified that Child being adopted by Foster Mother will allow him to maintain his relationship with Mother. See id. at 35. Newhouse stated that she believes it would best serve the developmental, physical and emotional needs and welfare of Child for Foster Mother to adopt him. See id. at 35.

Green also stated that Child is bonded with Mother. See id. at 51. Green testified that Child is happy when Mother arrives at the visits, and Child provides Mother with spontaneous affection. See id. Green noted that Mother loves Child and wants the best for him. See id. at 52. Green stated that she still has concerns for Child's safety on the basis of Mother's mental health, Mother's verbal aggression toward Child, Mother's lack of patience and her lack of understanding of age-appropriate expectations. See id. at 53-54.

Carter stated that Child is very comfortable with his Foster family and refers to Foster Mother as "Mom." Id. at 62. Carter informed the court that Child hugs Foster Mother and wants to stay close to Foster Mother. See id. at 62-63.

Carter testified that Child interacts well with his Foster siblings. See id. at 62. Carter opined that Foster Mother and Mother have a good sister relationship where Foster Mother is able to calm her down when Mother gets upset. See id. at 64. Carter stated that Foster Mother wants to continue to have Mother visit Child. See id. at 63. Carter testified that Mother loves Child. See id. Carter stated that Child responds favorably to Mother. See id. Carter stated that if Mother's parental rights were terminated, Child would not be losing a necessary and beneficial relationship with Mother. See id. at 64.

Based on this record, the court did not err in concluding that involuntarily terminating Mother's parental rights would best serve the developmental, physical and emotional needs and welfare of Child. The evidence also establishes Child receives consistency and permanency by having his emotional and developmental needs met by Foster Mother. The benefit of Child living with Foster Mother is that Mother can still maintain a bond with Child. As such, the trial court correctly prioritized Child's emotional well-being and need for safety, permanency and stability over Mother's wishes.

While Mother may profess to love Child, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. See In re Z.P., 994 A.2d at 1121. As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." Id. at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." In re B., N.M., 856 A.2d 847, 856 (Pa. Super. 2004) (citation omitted). It is well-settled that "we will not toll the well-being and permanency of [a child] indefinitely." In re Adoption of C.L.G., 956 A.2d at 1007 (citation omitted). The failure to terminate Mother's parental rights would condemn Child to a life in foster care with no

possibility of obtaining a permanent and stable home. As there is competent evidence in the record that supports the trial court's findings and credibility determinations, we find no abuse of the trial court's discretion in terminating Mother's parental rights to Child under Section 2511(b).

Accordingly, we find no abuse of the trial court's discretion in terminating Mother's parental rights to Child. We, therefore, affirm the termination order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/5/2019